AO 91 (Rev. 11/82)                          **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA v. JOHN GARBINO | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO. **SA16-324M** |

**Complaint for violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A): Illegal Remuneration Involving A Federal Health Care Program**

| NAME OF MAGISTRATE JUDGE HONORABLE KAREN E. SCOTT | UNITED STATES MAGISTRATE JUDGE | LOCATION Santa Ana, California |
|---|---|---|

| DATE OF OFFENSE In or about June, 2015 | PLACE OF OFFENSE Orange County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[42 U.S.C. § 1320a-7b(b)(1)(A)]

In or about June, 2015, in Orange County, within the Central District of California, defendant JOHN GARBINO, together with others known and unknown, knowingly and willfully, received remuneration, that is, approximately $926,563 in the form of two checks, one deposited on or about June 8, 2015, and the other deposited on or about June 24, 2015, into a bank account in the name of Sano Medical Consultants LLC, an account controlled by defendant JOHN GARBINO, in return for referring individuals to seek compounded medication prescriptions for which payment could be made in whole and in part under a Federal health care program, namely Tricare.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached Affidavit which is incorporated herein by this reference as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT **MONICA PANDIS** /s/ |
|---|---|
| | OFFICIAL TITLE Special Agent – Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) /s/   KAREN E. SCOTT | DATE June 20, 2016 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA: Mark Aveis, USAO CDCA, Major Frauds Section, (213) 894-4477                REC: BOND

### AFFIDAVIT

I, MONICA PANDIS, being duly sworn, declare and state as follows:

## I.   AFFIANT'S BACKGROUND

1.   I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI").  I have been so employed since approximately June 2002.  I am currently assigned to the white collar crime squad of the Orange County Resident Agency of the Los Angeles FBI Field Division, which investigates allegations of Public Corruption and Health Care Fraud.  Over the past 14 years I have been assigned to investigate Health Care Fraud.  As an FBI SA, I have investigated over 50 health care fraud and other white-collar cases including cases involving the payment of illegal kickbacks affecting federal health care programs.  Before becoming an FBI SA, I was a medical social worker assigned to hospice and pediatric HIV patients.  I have a Master's Degree in Social Work, a Bachelor's Degree in Behavioral Science and a Minor in Criminal Justice and Corrections.

## II.   PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a complaint and request for the issuance of an arrest warrant charging JOHN GARBINO with Illegal Remunerations for Health Care Referrals, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, documents obtained from various sources including financial institutions, information obtained from various law enforcement personnel, and

1

from witnesses.  This affidavit is intended to show only that
there is probable cause to support the referenced complaint and
request for issuance of an arrest warrant for GARBINO.  It does
not purport to set forth all of my knowledge of or investigation
into this matter, nor is it intended to provide all of the in-
formation obtained in connection with the investigation.  Also,
unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only, and are not *verbatim.*

**III.  SUMMARY OF PROBABLE CAUSE**

4.    Based upon the evidence stated herein, I have probable
cause to believe that GARBINO received illegal remuneration in
exchange for referring Tricare-reimbursable prescription medica-
tion to pharmacies.  Furthermore, GARBINO fabricated documents
to cover-up his offense conduct and encouraged another individu-
al to make false statements to law enforcement in order to fur-
ther conceal GARBINO's offense conduct.

**IV.    STATEMENT OF PROBABLE CAUSE**

A.    BACKGROUND

TRICARE[1]

5.    "In 1994, Tricare replaced CHAMPUS as the health care
program for active-duty military personnel, retirees, and their
families.  See http:// www.Tricare.mil/faqs/question . . . ,"

---

[1]  Statutory and case citations and legal analysis have been
prepared by the Assistant U.S. Attorney with whom I am working
on this investigation.  I have relied upon those citations and
that analysis in support of this affidavit.

U.S. ex rel. Nowak v. Medtronic, Inc., 806 F. Supp. 2d 310, 318,
note 5 (D. Mass. 2011), as a "comprehensive managed health care
program for the delivery and financing of health care services
in the Military Health System," see 32 C.F.R. § 199.17(a).  Tri-
care is applicable to all of the uniformed services.  32 C.F.R.
§ 199.17(a)(3).  "[A]ll CHAMPUS-eligible beneficiaries who are
not Medicare eligible on the basis of age are eligible to enroll
in" a Tricare program.  32 C.F.R. § 199.17(c).  Tricare is a
"health care benefit program" as defined by 18 U.S.C. § 24(b),
that affects commerce, see Taylor v. United States, 89 F.Supp.3d
766, n. 1 (E.D.N.C. 2014), and as that term is used in 18 U.S.C.
§ 1347.  Tricare is administered by the Defense Health Agency
("DHA").

Compounded Medications

6.    During the course of this investigation, I have
learned from reviewing documents, witness interviews, and speak-
ing with other investigators involved in the investigation,
that:

a.    In general, "compounding" is a practice in which
a licensed pharmacist, a licensed physician, or, in the case of
an outsourcing facility, a person under the supervision of a li-
censed pharmacist, combines, mixes, or alters ingredients of a
drug or multiple drugs to create a drug tailored to the needs of
an individual patient.

b.    Compounded drugs are not FDA-approved, that is,
the FDA does not verify the safety, potency, effectiveness, or
manufacturing quality of compounded drugs.  The California Board

of Pharmacy regulates the practice of compounding in the State
of California.

c.   Compounded drugs may be prescribed when an FDA-
approved drug does not meet the health needs of a particular pa-
tient.  For example, if a patient is allergic to a specific in-
gredient in an FDA-approved medication, such as a dye or a pre-
servative, a compounded drug can be prepared excluding the sub-
stance that triggers the allergic reaction.  Compounded drugs
may also be prescribed when a patient cannot consume a medica-
tion by traditional means, such as an elderly patient or child
who cannot swallow an FDA-approved pill and needs the drug in a
liquid form that is not otherwise available.

d.   The compounded medication prescriptions in this
case were ostensibly prescribed for the treatment of pain, scar-
ring, stretch marks, erectile dysfunction, or for "general well-
ness."  The prescriptions were based on substantially similar 8
1/2" x 11" forms with check-the-box sections that described the
chemical compounds for each of these conditions.  Although it
may be possible, I have reviewed hundreds of these forms, and
discussed well over a thousand of these forms with other agents
involved in this and related investigations, and I am not aware
of any instances in which a prescribing physician altered the
pre-formulated prescriptions to suit the individual needs of any
patient.

Anti-Kickback Statute

7.   The federal health care anti-kickback statute, at 42
U.S.C. § 1320a-7(b)(1)(A), ("AKS") prohibits the receipt of any

4

remuneration (including any kickback, bribe, or rebate) for re-
ferrals in connection with federal health care programs such as
Tricare.  To prove a violation of the AKS, the government must
prove each of the following elements beyond a reasonable doubt:

     (1) The defendant knowingly and willfully received re-
muneration, directly or indirectly, overtly or covertly;

     (2) In return for the referral of an individual to a
person for the furnishing or arranging for the furnishing of any
item or service; and

     (3) Payment was or would be made in whole or in part
under a federal health care program.

    See, e.g., United States v. Patel, 17 F.Supp.3d 823, 824
(N.D.Ill. 2014).

    8.  The government need not prove that a defendant had ac-
tual knowledge of the AKS or a specific intent to violate it.
42 U.S.C. § 1320a-7(b)(h); United States v. St. Junius, 739 F.3d
193, 210 (5th Cir. 2013) ("Section 1320a-7b(h) clarifies that
the Government is not required to prove actual knowledge of the
Anti-Kickback Statute or specific intent to violate it.  In-
stead, the Government must prove that the defendant willfully
committed an act that violated the Anti-Kickback Statute.").
"The [AKS] is not a highly technical tax or financial regulation
that poses a danger of ensnaring persons engaged in apparently
innocent conduct.  Rather, the giving or taking of kickbacks for
medical referrals is hardly the sort of activity a person might
expect to be legal." United States v. Vernon, 723 F.3d. 1234,
1259 (11th Cir. 2013), citing United States v. Starks, 157 F.3d

833, 838 (11th Cir. 1998).  The AKS may be violated even where
the referral payment has multiple purposes, so long as at least
one purpose was to induce referrals (as opposed, for example, to
compensate for advertising expense).  United States v.
McClatchey, 217 F.3d 823, 835 (10th Cir. 2000); United States v.
Kats, 871 F.2d 105, 108 (9th Cir. 1989).  Evidence that an indi-
vidual engaged in illegal kickbacks may include that the kick-
back payor deliberately mischaracterized a kickback as a seem-
ingly legitimate expense.  See, e.g., United States v. Moran,
778 F.3d 942, 953 (11th Cir. 2015) (kickback payor "initiated
the plan to have the patient recruiters [kickback payees] sign
fraudulent ''case manager'' contracts" to create appearance of
legitimacy for kickbacks).

        Telemedicine

        9.    During the course of this investigation, I have
learned from interviewing and reviewing reports of interviews of
a pharmacist, pharmacy technicians, pharmacy owners and others
that, although a prescription is typically delivered to a phar-
macy by the patient for whom the prescription is written, or
phoned-in or otherwise communicated directly by the prescribing
physician's office to the pharmacy for fulfillment, an enormous
number of compounded medications prescriptions -- in the thou-
sands during a few-month relevant time period in early to mid-
2015 -- were not delivered to pharmacies in that manner.  In-
stead, they were generated through online "telemedicine" sites
and then faxed to a pharmacy for fulfillment; the prescription
was not sent to the patient who, in turn, delivered the pre-

                            6

scription to the pharmacy of his/her choice for fulfillment.[2]  A
telemedicine site is ostensibly designed to assist individuals
in obtaining low-cost, easy access to health care for minor ail-
ments.  A patient is supposed to pay a small fee and complete an
online questionnaire whereby the patient describes his/her symp-
toms and provides some health history.  A doctor under contract
with the telemedicine site operator then receives and reviews
the questionnaire and, at least in theory, exercises independent
judgment to determine a course of treatment that may, or may
not, include prescription medication.

10.    Through interviews of doctors under contract with
telemedicine sites, and others, as well as discussions with oth-
ers involved in this investigation, I have learned that telemed-
icine site operators accepted payment from third parties to ad-
vertise compounded prescription medications.  More specifically,
for a fee, telemedicine site operators sent to their contract
doctors blank compounded medication prescription forms, or at
times, such forms with "boxes checked" for the prescription of
specific compounded medications, before the doctors had even re-
viewed a patient's questionnaire answers.  The site operators
encouraged their contract doctors to prescribe these medica-
tions.  At least two telemedicine site contract doctors told in-
vestigators that they were not paid unless they prescribed these
medications or that, with few exceptions that did not relate to

---

[2]  In fact, I have learned that dozens, if not hundreds, of
patients who received these prescriptions knew nothing about
them until the prescriptions showed up on their doorsteps.

their view of medical necessity, they always prescribed these medications.  One other telemedicine site contract doctor, Dr. N.C., whom I know agents interviewed and whose interview report I reviewed, told the agents that she was pressured by the site operator to prescribe these medications and, after refusing to do so, learned that the telemedicine site operator and ful-filling pharmacy had used her identity and medical credentials, without her permission, to fill dozens of prescriptions for these medications worth thousands of dollars in Tricare reim-bursements.  Dr. N.C. told the agents that the telemedicine site operator offered her $200,000 to remain silent and, if she re-fused, the site operator threatened to ruin her practice.

> B.   CRIMINAL INVESTIGATION

Tricare Beneficiary Complaints

11.   Based upon my discussion with agents of the Defense Criminal Investigation Service ("DCIS"), I learned the follow-ing:

a.   In 2015, DHA made a criminal referral to the DCIS based, in part, on complaints that DHA had received from Tricare beneficiaries.  Among other things, beneficiaries had complained about prescriptions for compounded medications.  For example, on or about April 14, 2015, Tricare beneficiary M.H. complained to DHA that M.H. had received an "Explanation of Benefits" form from Tricare stating that M.H. received a prescription for com-pounded medications for which the dispensing pharmacy had charged Tricare $59,362.33; that the beneficiary had never re-ceived the medication; that the beneficiary did not know the

8

prescribing physician; and that the beneficiary had received no phone calls about the medication. Tricare paid the dispensing pharmacy $46,981.59 on that claim.[3]

b.    At least twenty Tricare beneficiaries made similar complaints to DHA around this same period of time.

Investigation of Trucare Pharmacy's Tricare Claims

12.    I received and reviewed claims data from Tricare and DHA and learned the following:

a.    Trucare Pharmacy ("Trucare") was at the relevant time located at 1875 California Avenue, Corona, California.

b.    For the calendar year 2013, Trucare submitted approximately 48 claims to Tricare for reimbursement for filling compounded medication prescriptions, for a total amount of approximately $7,059, and on which Trucare was paid approximately $6,478. Trucare's Tricare claims for 2013 thus averaged approximately $147 per claim.

c.    For the calendar year 2014, Trucare submitted approximately 16 claims to Tricare for reimbursement for filling compounded medication prescriptions, for a total amount of approximately $18,698, and on which Trucare was paid approximately $16,400. Trucare's Tricare claims for 2014 thus averaged approximately $1,025 per claim. Based upon my review of Tricare and DHA data, and my discussions with other agents involved in this investigation, who have reviewed the same data, I believe

---

[3]  I reviewed Tricare claims data and noticed that it was not uncommon for Tricare to reimburse for less than the amount of a claim.

that the greater per-claim and per-reimbursement rates for 2014 were the result of a rash of claims for filling compounded medication prescriptions that had been specially formulated to achieve the highest possible reimbursement rates rather than the greatest medical efficacy.

       d.   For the calendar year 2015, Trucare submitted approximately 336 claims to Tricare for reimbursement for filling compounded medication prescriptions, for a total amount of approximately $7,267,290, and on which Trucare was paid approximately $5,933,564. Trucare's claims for 2015 thus averaged approximately $17,659 per claim. As stated above, I believe that the greater per-claim and per-reimbursement rates for 2015 were the result of a huge influx of claims for filling compounded medication prescriptions that had been specially formulated to achieve the highest possible reimbursement rates rather than the greatest medical efficacy. By early May 2015, Tricare changed its claims evaluation practices and stopped honoring claims for the bulk of these formulations.

<u>Investigation of Haeoyou Pharmacy's Tricare Claims</u>

    13.   I received and reviewed claims data from Tricare and DHA and learned the following:

       a.   Haeoyou Pharmacy ("Haeoyou") is located in Palmdale, California.

       b.   For calendar year 2013, Haeoyou submitted zero claims to Tricare for reimbursement for filling compounded medication prescriptions.

      c.    For calendar year 2014, Haeoyou submitted approximately 31 claims to Tricare for reimbursement for filling compounded medication prescriptions, and was paid approximately $62,278 on those claims.

      d.    For calendar year 2015, Haeoyou submitted approximately 2,798 claims to Tricare for reimbursement for filling compounded medication prescriptions, and was paid approximately $46,294,453 on those claims, for an average of approximately $16,546 per claim.

      e.    For calendar year 2015, Tricare paid Haeoyou approximately $4,366,638 based on compounded medication prescriptions that reflected Dr. N.C. as the prescribing physician.

Initial Interview of M.K.

14.    On April 13, 2016, I interviewed M.K. who told me the following:

      a.    He is a part-owner of Trucare.  He is a licensed pharmacist and was the pharmacist-in-charge at Trucare at all relevant times.

      b.    Trucare specializes in creating compounding creams among other drugs.

      c.    Between late 2014 and mid-2015, Tricare reimbursements paid to Trucare for filling compounded medication prescriptions accounted for 20% of Trucare's business.

      d.    It was illegal to pay outside marketers to refer prescriptions for which reimbursement was sought from Tricare or Medicare, and he (M.K.) knew that during the time in 2014-2015

when Trucare filled compounded medication prescriptions for
which Trucare sought Tricare reimbursements.

e.   M.K. had never heard of Clevis Management, Ha-
oeyou, or J.C., among others.

f.   M.K. had heard of "Sano" but he refused to dis-
cuss his involvement with Sano except to say that it was related
to marketing.

g.   After being advised that it was a crime to lie to
federal agents, M.K. declined to change any of his answers.

Trucare's Referral Contracts with HP and Sano

15.   I know that the government subpoenaed certain docu-
ments from Trucare and that, after M.K.'s initial interview,
M.K. provided the government with documents relating to Trucare,
Sano, and Haeoyou.   I observed the following from these docu-
ments:

a.   A "Manufacturing and Marketing Agreement" between
Trucare and Haeoyou, signed by M.K. on behalf of Trucare, and by
J.C. on behalf of Haoeyou, and made effective February 27, 2015.[4]
The agreement provided that Haoeyou would refer compounded medi-
cation prescriptions to Trucare and, in exchange, Trucare would
pay Haoeyou 65% of the amount that Trucare received as reim-
bursements on claims submitted for filling those prescriptions.
The agreement also contained a clause, at section 3.4, identi-

---

[4]   I know from my interview of J.C. that he controlled Clev-
is and, from that interview and from reviewing documents pro-
duced in this investigation, that Clevis did business as Haeoy-
ou.

fied as "ANTI-REFERRAL LAWS," that stated in part that "[t]he
parties acknowledges /sic/ that they may be subject to certain
federal laws governing referral of patients . . . including . .
. payments for referral or to induce the referral of patients .
. . [under] the Medicare/Medicaid Fraud and Abuse Law . . . ."
The agreement also stated, under section 8.1, entitled "NOTIC-
ES," that Haoeoyou's address was listed as 25971 Pala, Suite
120, Mission Viejo, California 92691.[5]

> b.   A "Consulting Services Agreement" between Trucare
and Sano, signed by M.K. on behalf of Trucare and GARBINO on be-
half of Sano, and "entered into as of March 1, 2015 . . . ."
This agreement stated that Trucare would pay Sano 65% of "Net
prescriptions billed and collected by [Trucare]."

Second Interview of M.K.

16.   On April 13, 2016, I again interviewed M.K., this
time pursuant to a proffer agreement between M.K. and the gov-
ernment that essentially granted to M.K. limited use immunity
for his statements, subject to certain conditions.  One of my
goals of that proffer was to confront M.K. about what I believed
were false statements that he had made to me, during his initial
interview, regarding his knowledge of Haeoyou, J.C., and Sano.
During that second interview, M.K. admitted that he had falsely

---

[5]   I know from reviewing documents obtained in this investi-
gation, including correspondence from targets, and from visiting
that location, that this addresswas, at the relevant time, the
office of Trestles RX LLC and Trestles Pain Management Special-
ists (collectively "Trestles") and Sano Medical Consultants LLC
("Sano").

denied knowing Haeoyou and J.C.  M.K. was also willing during
this second interview to discuss Sano.  Thus, during this second
interview, M.K. stated:

Early Referral Business With GARBINO

   a.   M.K. knew GARBINO and GARBINO owned Sano.  M.K.
had known GARBINO since about 2013 or earlier, when M.K. had
done business with GARBINO by paying GARBINO for the referral of
workers' compensation medication prescriptions.  GARBINO at that
time had told M.K. that paying such referral fees was legal be-
cause GARBINO was doing the same business with other pharmacies.
M.K. paid GARBINO by check and wrote "marketing services" in the
memo section of the checks to GARBINO even though GARBINO did
not do any actual marketing services for M.K., such as advertis-
ing, creating flyers, sending mailings or coupons, or any other
traditional marketing services.

Overflow Prescriptions Referred By Trestles

   b.   In or about January 2015, M.K., on behalf of Tru-
care, was solicited to fill Tricare-reimbursable compounded med-
ication prescriptions.  M.K. understood that these prescriptions
were "overflow" prescriptions (the "Overflow Prescriptions")
that Trestles had referred to Haoeyou in exchange for a referral
fee, but that Haoeyou lacked the ability to fill the prescrip-
tions.  M.K. believed that Trestles was controlled by GARBINO,
D.F., and R.R.  M.K. believed that R.R. was also Trestles' in-
house counsel.

   c.   M.K., on behalf of Trucare, agreed to fill the
Overflow Prescriptions.  M.K. knew that it was illegal to pay

14

referral fees for Tricare-reimbursable prescriptions.  The indi-
vidual who initially solicited M.K. for Trucare to fill the
Overflow Prescriptions, D.V., told M.K. that they could do a
"work around."

> GARBINO'S Visit to Trucare and Discussion About Red Flags
> Regarding the Overflow Prescriptions

d.   GARBINO and Trestles purported co-owner D.F.[6] vis-
ited Trucare to ensure that Trucare. would correctly process the
Overflow Prescriptions.  M.K. told GARBINO and D.F. that Trucare
personnel intended to call the patients to verify the Overflow
Prescriptions.  GARBINO and D.F. objected.  M.K. also stated
that he thought the Overflow Prescriptions looked suspicious be-
cause some of the prescription forms called for prescribing at
least five different products.  D.F. told M.K. to fill prescrip-
tions for just three of the products on the forms and that
should not make them appear so suspicious.

e.   M.K. told GARBINO, D.F., and D.V. that the Over-
flow Prescriptions should be sent directly from doctors' offices
and not from marketers.  M.K. later learned instead that Tres-
tles sent the prescriptions to the pharmacies.[7]

---

[6]  GARBINO and D.F. were accompanied by D.V., who had ini-
tially solicited M.K. to fill the Overflow Prescriptions.

[7]  I know from interviewing other former Trestles distribu-
tors, including J.B. and L.M., and from reviewing Trestles docu-
ments obtained by a former Trestles employee, V.P., that Tres-
tles' so-called marketers were known within Trestles as "dis-
tributors" and were assigned unique "e-fax" numbers.  Prescrip-
tions obtained in large part from telemedicine site activity
were "e-faxed" to the pharmacy of Trestles' choice, both to ena-
ble Trestles to track the progress of fulfillment and claims re-

f.   M.K. estimated that Trucare received approximate-ly 200 Overflow Prescriptions over a period of about three weeks.   Thereafter TP refused to process any more Overflow Pre-scriptions in part because M.K. learned about improprieties for hundreds of compounded medication prescriptions purportedly au-thorized by Dr. P.B., who was the subject of a national news re-port.[8]  M.K. then suspected that *all* of the Overflow Prescrip-tions were bogus.   GARBINO and D.F. nonetheless pushed M.K. to keep filling them and to not worry about what M.K. perceived as problems with telemedicine doctors' prescriptions, including those purportedly authorized by Dr. P.B.[9]

The Fraudulent Invoices

g.   At some point around May or June 2015, GARBINO and Trestles' purported co-owner D.F. demanded that Trucare pay Trestles a referral fee for the Overflow Prescriptions.   M.K. refused because his lawyer told him and, in turn, M.K. told GARBINO, that such payments would be illegal.

---

imbursement for each prescription, and so that Trestles could chose the pharmacy that would pay the highest possible referral fee.   For example, Haeoyou had agreed to pay Trestles 65% of fi-nal Tricare claims adjudications.

[8]   I know that, on or about May 6, 2015, CBS aired a news report that stated, in part, that Dr. P.B. had authorized com-pounded medications prescriptions. http://www.cbsnews.com/news/doctors-complicit-costly-abuse-military-health-care-system/.

[9]   I know from reviewing emails in or about late April-early May 2015, provided by a cooperating, former sales distributor of Trestles, that GARBINO, D.F., and Trestles purported co-owner R.R. were aware that Dr. P.B. was a telemedicine doctor and had denied authorizing numerous prescriptions that Trestles had re-ferred to HY for fulfillment in exchange for a referral fee.

h.    As a work-around, GARBINO proposed that Trucare could pay referral fees owed on the Overflow Prescriptions by calling those referral fees an "advance" on GARBINO's other business, Sano, for referring non-Tricare workers' compensation prescriptions to Trucare.

17.    Based on M.K.'s interview statements, and on my review of bank records obtained and emails provided by M.K. during this investigation, I learned the following:

a.    On or about June 10, 2015, B.K.[10] emailed M.K., with a "cc" to "garbs92629@gmail.com,"[11] a document entitled "invoice" dated June 10, 2015.  The "invoice" stated that Trucare owed Sano 65% of the "billed amount" for "workers' compensation," totaling $997,608.

b.    On or about June 24, 2015, B.K. emailed M.K., with a "cc" to "garbs92629@gmail.com," another "invoice," dated June 24, 2015.  This "invoice" described a "sales amount" for "May - June 10" of "W/C" of approximately $1,458,685, against which Trucare owed Sano $926,563.

c.    I calculated that $926,563 is approximately 64% of $1,458,685, or approximately $21,582 less than TP would purportedly owe pursuant to its 65% agreement with Sano, described

---

[10]    I believe, from Trestles and Sano emails and from internal Trestles documents obtained from former Trestles employees or distributors, that B.K. worked below GARBINO at Trestles and Sano.

[11]    I believe that this email address belonged to GARBINO based on my review of several emails, including one dated April 6, 2015, from "John Garbino (garbs92629@gmail.com)" to D.V.

above.  Based upon my knowledge of this case as described here-
in, and from speaking with other agents involved in this inves-
tigation, I have probable cause to believe that this calculation
helps establish that the "invoices" were fraudulent because (1)
GARBINO and others seeking to collect referral fees for the Tri-
care-reimbursable Overflow Prescriptions had made clear that
they were owed 65% on adjudicated payments; there was no good
reason for them, especially given their general desire to col-
lect what they believed was debt, to give-up more than $21,000
of that claim, and (2) as shown more fully below, the claimed
debt of $926,563 that GARBINO characterized as related to non-
Tricare referrals was substantially the same as 65% of the final
Tricare adjudications for the Overflow Prescriptions.  Had the
numbers been the same, it simply would have been even more sus-
picious.

     d.   Sano bank records show that Trucare paid Sano ap-
proximately $926,563 via two checks, on or about June 9, 2015
and on or about June 24, 2015.  The same records show that the
Sano bank account into which Trucare's payments were made was
opened only a few days before Trucare's first payment, on or
about June 3, 2015.

     e.   Sano bank records also show no other significant
deposits after the opening of that account (June 3, 2015), and
that approximately $685,000 of the credit to that account due to
Trucare's checks was transferred fairly quickly to an account in
the name of Trestles Pain Specialists LLC.

f.   Sano bank records further show that GARBINO and Trestles' in-house counsel R.R. were the authorized signatories for the Sano bank account into which Trucare's checks were deposited.  Trestles Pain Specialists, LLC bank records show that GARBINO was its authorized signatory.  D.F., who had accompanied GARBINO to TP and who had made a demand for Trucare to pay referral fees for the Overflow Prescriptions, as stated above, was also identified as a "member."

18.   I reviewed a certain spreadsheet provided by M.K. to DCIS Special Agent Timothy Nugent, who I know is co-investigating this case.  SA Nugent who told me about the spreadsheet's origin from his discussions with M.K.  From this evidence, I learned the following:

a.   M.K. sent SA Nugent a spreadsheet in or about May 2016 that M.K. prepared to show details of the Tricare reimbursement payments related to the Overflow Prescriptions.

b.   The spreadsheet showed "net commission" of $937,969.96, or 65% of and against the reimbursement payments, and after expenses, of $1,443,030.70.  M.K. told SA Nugent that the "net commission" figure was based upon GARBINO's and others' demands for payment for referral fees for the Overflow Prescriptions.

19.   I also reviewed an email from M.K., dated August 6, 2015, showing its sender as "[B.K.]@sanomedical.net," with a "cc" to an email address that I know, as mentioned above, was used by GARBINO.  The email stated:

19

"Hello [M.K.], Attached is an [Explanation of
Benefits] from a patient that was processed at [Tru
care]. It shows Tricare paid $12,042.92 for two [com
pounded] creams.  We were paid our percentage on the
total of $9,634.34 for this patient.  The difference
is $2,408.58.  If you could please let us know about
the difference of $2,408.58.  Thanks,…"

20.    I compared the patient and prescription information
described in the above-referenced email with M.K.'s spreadsheet,
as described above, and have probable cause to believe that,
when read together and in light of the evidence stated herein,
the spreadsheet accurately represented Tricare reimbursements
paid to Trucare for the Overflow Prescriptions, and that the
$926,563 payment from Trucare to Sano in June 2015 was compensa-
tion for Tricare-reimbursable Overflow Prescriptions and *not* for
the referral of so-called workers' compensation prescriptions.
Thus, I have probable cause to believe, based on the same evi-
dence, that GARBINO prepared or caused others to prepare the
purported "workers' compensation" invoices in order to knowingly
conceal illegal referral fees paid or to be paid.

Covertly-Recorded Meeting Between GARBINO and M.K.

21.    On April 25, 2016, M.K. participated in a covert,
consensually-monitored (video-taped) meeting with GARBINO.  I
reviewed the recording and transcript of that meeting, and dis-
cussed that meeting with agents who monitored the statements
made by M.K. and GARBINO and who told me that the recording and
transcript accurately depict the substance of the statements

20

made during that meeting.  In addition to what I believe were
GARBINO's admissions that the so-called workers' compensation
invoices were bogus, I also believe that GARBINO counseled M.K.
to fabricate a story to conceal the truth about the invoices and
advanced a sham and insincere "advice of counsel" defense.
GARBINO stated that:

        a.   He owned Sano.

        b.   Trestles did Tricare business from December 2014
until April 2015.

        c.   Trestles sent Tricare business to Haeoyou.
Haeoyou transferred that business to Trucare and Trucare filled
that business.

        d.   "And while we feel like we're at like this giant
circle of investigation that they're looking at, we're a very
small pimple of everything that's going on."

        e.   M.K. had "specifically said" that Trucare would
not pay referral fees on Tricare-reimbursable prescription re-
ferrals.  M.K. was "adamant about not paying Sano on Tricare . .
. prescriptions."  "So, through [D.F.] and [R.R.]'s influence
[Trucare] paid $926,000 to Sano Medical which was based on Tri-
care adjudicated business.  But we categorized it as a Workers'
Comp advance because we had enough business to do so and [Tru-
care]was not going to pay on Tricare."

        f.   [In response to M.K. stating that law enforcement
will notice that the $926,563 payment from Trucare to Sano sub-
stantially equaled 65% of the Tricare reimbursements for the
Overflow Prescriptions, GARBINO stated], "[b]ut Matt [M.K.'s

nickname].  Matt, the numbers being the same - you decided to
pay that money to us as a Workers' Comp advance.  Whether it was
the exact number or not the fact that it's categorized as a
Worker's Comp advance doesn't mean it's Tricare.  That's what my
attorneys told me today.  When it becomes Tricare is when you
chose once the money comes in to pay us again on it.  I'm here
telling you we're not seeking that money.  I'm telling you right
now that we're considering that business as a Worker's Comp pay-
ment.  At my own financial hardship I'm saying that. . . "that's
where my story comes from. . .  When do you meet with your at-
torney?"

        g.    "I mean honestly when I met with my attorney he
was like, . . . 'you're my guys now, They're not.'  I'm like,
'[D.F. and R.R. are] not.' 'What do I do?' He basically said
straight out, 'Fuck those guys.' Its what he told me.  So, I'm
in it to protect myself.  You're in it to protect yourself.  And
we need to protect each - we need to protect ourselves. . .
[M]y attorneys have advised me that I've got [to] 100 percent
separate from [D.F.] because he's being looked at as really the
ring leader . . . ."

        h.    "[M]y argument has to coincide with your argu-
ment.  And I'm not going to go tell my side of the story and
have that be completely different from your side of the story .
. . before I go in to speak with the prosecuting attorney, I
will not go in there unless I've got my story 100 percent down,
and that's my story that was my role in Trestles . . .  It will
be my story in working with you.  I mean, there's not going to

be anything where you're going to walk in and speak with [the prosecutors] and your story of how this whole thing transpired is different than mine. . . [let's] explain our program to [our attorneys] that it's 100 percent the same. So, that they're not hearing a different story from you than they are from me."

        i. "My fight is to legitimize how the payments were made."

        j. "And the bottom line is that my company [where] my defense comes in at is we had our contracts vetted out by attorneys. We were doing everything based on the advice of our attorneys, whether it was [R.R.] or the healthcare attorneys, the pharmacies, whatever it was. We were working within what we thought were the confines of the law. And there was never a criminal intent of anything that we ever wanted or with anything that we tried to do. . . I mean, I had an attorney that was a partner in my company and was supposed to be watching over all the shit that we did. . . We even had an additional healthcare attorney that we hired outside of our own attorney that was supposed to be vetting stuff. The contracts that were signed by the pharmacies all had their healthcare attorneys. You had [your own attorney] that even modified our contract. He's one of the top healthcare attorneys in the country."

        k. "Does [your attorney] have any pull with [the prosecutor, AUSA] Mark Aveis?"

        l. "My argument has to coincide with your argument . . . . I'm not going to tell my side of the story and have that be completely different from your side of the story."

m.    "I have to 100% separate myself from D.F. . . . .
He's being looked at as the ringleader - his fight is differ-
ent."

22.    I reviewed an email dated May 18, 2016 from R.R. to
Trucare's corporate lawyer[12] in which R.R. indicated that he
would file a civil complaint against Trucare and M.K. "tomorrow
if I do not hear from you and this gets resolved today."  R.R.
attached a draft complaint to that email.  I reviewed the at-
tached draft civil complaint and observed the following allega-
tions:

a.    Sano's principal place of business was in Orange
County, California.

b.    "On March 1, 2015 Sano and [Trucare] entered into
[a] Consulting Services Agreement  . . . [by which] . . . [Tru-
care] would pay Sano 65% of the payment [Trucare] receives on
the sale of each Compound Pain Cream."

c.    "The total sums [Trucare] has billed all payors
through February 2016, including billing for TriCare Federal
Program patient . . . is in excess of $26 million which if the
total sum is collected would mean [Trucare] will owe Sano
$16,900,000."

d.    "[Trucare] has billed TriCare Federal Program pa-
tients through February 2016 $926,562.98 . . . ."

e.    "[M.K.] has informed Sano that he and [Trucare]
are being investigated by the U.S. Attorney's Office for [Tru-

---

12    Trucare is a fictitious business name of Egyptian, Inc.

24

care] TriCare billing and in or about March 2016, [M.K.] re-
quested Sano to issue a false billing statement for the TriCare
Billing and to state that it was billing for Compound Pain Cream
for California Worker Compensation patients and not for TriCare
billing.  Sano advised [M.K.] that it would not participate in
any form of subornation of perjury or make any false statement
concerning the Compound Pain Cream or TriCare Billing."

23.    I have probable cause to believe, based on the evi-
dence described herein, that the allegations of the draft com-
plaint provide additional evidence of GARBINO's criminal intent
and knowledge.  First, the complaint was drafted by R.R., a
Trestles insider with close ties to GARBINO, on behalf of Sano
which is wholly owned by GARBINO.  The complaint may reasonably
be read as if GARBINO is asserting facts on which he believes he
is entitled to recovery.  Next, despite what plainly appears to
be GARBINO's effort to re-characterize, after-the-fact, the
$926,563 payment as an advance against non-Tricare-reimbursable
prescription referrals, the complaint plainly characterizes that
payment as from Tricare referrals.  Next, there is no evidence
that M.K. requested any type of billing in March 2016.  Next, a
plain and fair interpretation of GARBINO's extemporaneous state-
ments during the April 2016 consensually-monitored call, de-
scribed above, leads to the reasonable conclusion that GARBINO
suggested and prepared the fraudulent invoices, not M.K.

C.    DEFENSES

Advice-of-Counsel

24.    I have learned from other investigators involved in this investigation, and from the recording and transcript described above, that GARBINO has stated that he acted on the advice of counsel in seeking to collect and in collecting fees for Tricare-reimbursable prescriptions that his businesses had referred to pharmacies.  For example, I interviewed former Trestles distributor J.B., and spoke to investigators who interviewed former Trestles distributor L.M., who told me that GARBINO frequently mentioned at Trestles' headquarters that they would have to "ask [A.]" or "ask [R.R.]," both attorneys, about how to take some action or another regarding Trestles.  I also know that, in support of its civil case against Haeoyou that Trestles filed in or about May 2015, (discussed below), Trestles introduced a declaration of attorney A.D., that I have reviewed, who declared that he was an expert in healthcare law and, having reviewed a contract between Trestles and Haeoyou that called for referral payments, he believed that a provision in the contract that mentioned the AKS showed that the parties did not intend to violate that law.  In that same declaration, A.D. also stated that the "employment" safe harbor exemption in the AKS, discussed below, might apply.  Additionally, in connection with the same civil case of Trestles against Haeoyou, Trestles produced a memorandum purportedly dated April 6, 2015 that was purportedly prepared by Trestles co-owner and in-house counsel R.R.  In that memorandum, that I reviewed, R.R. purportedly opined that the

26

AKS did not prohibit Trestles' right to fees for referring pre-
scriptions because Tricare was "funded by private health insur-
ance," notwithstanding that, in the same memorandum, R.R. stated
that "Tricare is a federal Program for providing medical care to
military personnel . . ." and that "a percentage payment ar-
rangement which involved Medicare, which is funded by Federal
taxpayers, . . . would be illegal."[13]

25.   Based on my training and experience, and discussions
with other investigators and prosecutors, I believe that, in or-
der to prevail on an advice of counsel defense, a defendant must
establish that, before taking any action, defendant, [1] while
acting in good faith and [2] for the purpose of securing advice
on the lawfulness of his possible future conduct, [3] sought and
obtained the advice of an attorney [4] whom he considered to be
competent, and [5] made a full and accurate report or disclosure
to his attorney of all important and material facts of which he
had knowledge or had the means of knowing, and [6] acted strict-
ly in accordance with the advice his attorney gave following
this full report or disclosure. See Devitt and Blackmar, Feder-
al Jury Practice and Instructions, 19.08 (Action on Advice of
Counsel Explained) (1992).

---

[13] GARBINO may argue that he relied on R.R.'s advice, even
if R.R.'s advice was wrong.  However, in light of all of the ev-
idence stated herein, I nonetheless believe there is probable
cause to believe that GARBINO did not rely on R.R.'s advice; had
he done so, GARBINO would not have needed to mis-characterize
the approximately $926,000 payment for the Overflow Prescrip-
tions as anything other than Tricare-reimbursable activity.

26.   Based on my training and experience, discussions with other investigators and prosecutors, and my review of the evidence in this as described above, I have probable cause to believe that this defense is a sham, insincere, and not likely to succeed for several reasons.  First, although witnesses, and perhaps GARBINO, allude to A.D. as having provided legal advice to Trestles during the offense conduct described herein, A.D. did not state that he had done so in his declaration described above.  Given that witnesses stated that A.D. was Trestles' outside counsel at the relevant time, it would have made more sense for A.D. to have declared that he counseled Trestles at the relevant time that Trestles' conduct was legal; he did not so declare.  Next, A.D.'s opinion in his declaration, that GARBINO and others may be exempt from AKS liability under the so-called "employment" safe-harbor exception, is meritless and indicates that GARBINO misled A.D. about the relationship between GARBINO, on the one hand, and Haeoyou and Trucare, on the other hand.  As discussed below, I have probable cause to believe that the "employment" safe-harbor exemption cannot apply because GARBINO was not employed by either Haeoyou or Trucare.  Next, R.R.'s purported opinion memorandum was dated more than three months after Trestles had already referred compounded medications prescriptions to Haeoyou and to Trucare.  Thus, unless GARBINO were to testify that R.R. orally provided the same opinion prior to that time, it would likely be seen as concocted after-the-fact.  Next, R.R. was a purported co-owner of Trestles.  His bias and interest in an outcome favorable to GARBINO would be difficult

28

to overcome.  Next, based on my training and experience, and re-view of the evidence in this case, including Tricare data and payments, R.R.'s opinion incorrectly stated that Tricare was a privately-funded program.  A simple Internet search would have shown that Tricare was and is a federal health care program.

Anti-Kickback "Safe Harbors"

27.   The AKS has several safe harbors as well as an im-plied safe harbor that results from either getting or to some extent relying on advisory opinions from the U.S. Department of Health and Human Services ("HHS").  42 C.F.R. § 1001.952.  The first safe harbor is a "referral service."  A payment to a "re-ferral service" may be exempt from AKS liability if it meets four requirements, set forth in 42 C.F.R. § 1001.952(f), includ-ing that payments must be based on the cost of operating the re-ferral service, and not on the volume or value of any referrals to or business otherwise generated.  I know from the evidence gathered in this and related investigations that dispensing pharmacies claimed thousands of dollars *per prescription* in seeking reimbursement from Tricare and, in turn, paid large amounts of those reimbursements to cappers that were tied to a percentage of the volume and value of referrals.  Thus, I be-lieve that there is probable cause to believe that GARBINO's ac-tivities did not meet the test for the "referral service" exemp-tion described above because the payments to him appeared to be based on the volume and value of the business he generated by his referrals, and were not based on the actual or legitimate cost of operating a <u>bona fide</u> referral service.

28.    I further believe that GARBINO cannot claim the employee exemption either, 42 C.F.R. § 1001.952(i), that exempts payments in a bona fide employment relationship.  At least under Medicare AKS case law, "the safe-harbor provision relies on 26 U.S.C. § 3121(d)(2) for the definition that an employee is 'any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee.'"  United States v. Robinson, 505 F.App'x. 385, 387 (5th Cir. 2013).  GARBINO operated his own referral service, namely Trestles and Sano, and was not employed by the pharmacies to whom he had referred, or intended to refer, prescriptions for fulfillment in exchange for a fee.

29.    Finally, based on my discussions with others involved in this investigation, I have learned that GARBINO had not sought and was not identified as the subject of an HHS advisory opinion.

**IV.    CONCLUSION**

30.    For all of the reasons described above, I believe

there is probable cause to believe that JOHN GARBINO received illegal remuneration, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(A).

_____
Monica Pandis, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this _20_ day of June, 2016.


_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE

KAREN E. SCOTT

31